

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00188-CR

———————————————

JESUS FUENTES, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 355th District Court
Hood County, Texas
rial Court No. CR14753

Before Birdwell, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Jesus Jose Fuentes appeals his conviction for continuous sexual abuse of a child. *See* Tex. Penal Code Ann. § 21.02. In two issues, Fuentes contends the trial court abused its discretion by admitting into evidence an audio recording of his telephone call with the complainant's mother and an audio recording of his interview by an investigator with the district attorney's office. We conclude that the trial court did not abuse its discretion by admitting the complained-of evidence and affirm the conviction.

## I. Background

Fuentes met the complainant, Z.G., and her mother (Mother)[1] at church when Z.G. was eleven or twelve years old. Fuentes was around sixty-five years old and quickly took on the role of Z.G.'s "grandfather." He would give Z.G. gifts, take her out to eat, give her rides to church and to her house, and spend time with her both alone and with her family. One day, within a year of meeting Z.G., Fuentes put his hand between Z.G.'s legs and rubbed her vagina, asking her how it felt, while they were sitting in his truck in the church parking lot. Approximately one week later, it happened again. Over the next two years following that first incident, similar incidents occurred on a weekly basis, including rubbing Z.G.'s vagina and touching her breast. The incidents occurred mostly in Fuentes's truck but also in Z.G.'s house. When she

---

[1]We use aliases to protect the complainant's identity. *See* Tex. R. App. P. 9.10(a)(3); 2d Tex. App. (Fort Worth) Loc. R. 7; *McLendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

was thirteen, Z.G. stopped seeing Fuentes altogether. At sixteen, Z.G. finally told Mother about the abuse.

Mother contacted law enforcement to report the abuse, and Investigator Katie Barton with the district attorney's office followed up with Mother. Barton began investigating the case and took reports from Z.G. and Mother. As part of the investigation, Barton had Mother call Fuentes on the phone, and Barton recorded the conversation with Mother's consent. At trial, the State offered and the trial court admitted—over Fuentes's objection—the audio recording of the phone call. In the recording, Fuentes can be heard telling Mother that he did not know if he had touched Z.G. and that if he had, it was an "accident." At one point, Mother asked Fuentes if he had touched Z.G. over or under her panties. Fuentes later stated that Z.G. had provoked him and that he did not "get that far" with her.

At some point after the phone call between Mother and Fuentes, Barton drove to Fuentes's place of employment and asked him to accompany her to the district attorney's office to speak with her. Fuentes agreed, and they went to Barton's office for an interview, which Barton recorded. During the interview, Fuentes admitted that he had touched Z.G's vagina several times both in his vehicle and at her house. After the conclusion of the interview, Barton placed Fuentes under arrest. At trial, the State offered as evidence the audio recording of the interview. Fuentes objected to both the audio recording and Barton's testimony about the interview. The trial court overruled Fuentes's objection, admitting the audio recording and allowing the testimony.

3

At the conclusion of his jury trial, Fuentes was found guilty of continuous sexual abuse of a child, and the trial court sentenced him to life imprisonment. This appeal followed.

## II. Standard of Review

We review a trial court's evidentiary rulings for an abuse of discretion.[2] *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). We will not reverse a trial court's decision to admit or exclude evidence unless the record shows a clear abuse of discretion. *Id.* An abuse of discretion occurs only when the trial court's ruling was so clearly wrong as to lie outside the zone within which reasonable persons might disagree. *Id.* We will not disturb the trial court's ruling if it was correct under any legal theory. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## III. The Recorded Phone Call

In his first issue, Fuentes argues that the trial court erred by admitting the audio recording of his phone call with Mother. At trial, Fuentes objected to the audio recording on the grounds that (1) he had not consented to the phone call, "in

---

[2]Fuentes did not file a motion to suppress the statements he made in either the audio recording of his phone call with Mother or the audio recording of his interview at Barton's office. We therefore do not apply a bifurcated standard of review. *See Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (reviewing trial court's ruling on motion to suppress evidence under bifurcated standard of review); *see also Alvarado-Gutierrez v. State*, No. 01-16-00756-CR, 2017 WL 4413948, at *6 n.9 (Tex. App.—Houston [1st Dist.] Oct. 5, 2017, pet. ref'd) (mem. op., not designated for publication) ("Because appellant did not file a motion to suppress . . . , the trial court was not required to make an independent finding as to whether his statement was . . . voluntary . . . or make written findings of fact and conclusions of law.").

4

violation of his Fifth Amendment right"; (2) it violated Articles 38.21 and 38.22 of the Code of Criminal Procedure; and (3) it was initiated by Investigator Barton. After confirming that Fuentes was not in custody at the time of the phone call, the trial court overruled Fuentes's objection and admitted the recording.

On appeal, Fuentes briefly argues that the trial court erred by admitting the recording because his "will was overborne" and his statements were involuntary under Article 38.21. After superficially arguing involuntariness, Fuentes asserts that the trial court's alleged error was harmful.

## A. Applicable Law

Under both constitutional law and state law, a defendant's statement or confession must be voluntary to be admissible. *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020); *see* Tex. Code Crim. Proc. Ann. art. 38.21 ("A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion . . . ."). A defendant may claim that his statement was involuntary and therefore may not be used as evidence against him under different theories: (1) general voluntariness, Tex. Code Crim. Proc. Ann. art. 38.22, § 6; (2) *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), as expanded in the Texas confession statute, Tex. Code Crim. Proc. Ann. art. 38.22 §§ 2, 3; and (3) the Due Process Clause. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). Involuntariness is reviewed under each of these theories by examining the

5

totality of the circumstances surrounding the statement or confession. *Lopez*, 610 S.W.3d at 494.

### 1. Due Process

A statement is involuntary for purposes of federal due process only when there is police overreaching, i.e., some coercive police activity causally related to the confession. *Oursbourn*, 259 S.W.3d at 169–70; *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); *cf. Miranda*, 384 U.S. at 478, 86 S. Ct. at 1630 ("Volunteered statements of any kind are not barred by the Fifth Amendment . . . ."); *Melton v. State*, 790 S.W.2d 322, 326 (Tex. Crim. App. 1990) (stating that a person's Fifth Amendment rights do not come into play before an investigation reaches the accusatorial or custodial stage). The Court of Criminal Appeals has explained that "[t]he Due Process Clause is aimed at protecting suspects from police overreaching, not at protecting people from themselves or other private actors."[3] *Oursbourn*, 259 S.W.3d at 170; *see also Colorado v. Connelly*, 479 U.S. 157, 166, 107 S. Ct. 515, 521 (1986) ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause."). Thus, due process and *Miranda* claims of involuntariness entail "an objective assessment of police behavior." *Oursbourn*, 259 S.W.3d at 171. The ultimate

---

[3]This is also true for *Miranda* rights and waivers that apply to custodial-interrogation statements. *Oursbourn*, 259 S.W.3d at 170. Here, Fuentes does not assert that the phone call was a custodial interrogation.

question is whether the defendant's will was overborne. *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).

Factors to consider in addressing whether a suspect's will has been overborne include the use of coercive tactics,[4] the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food, sleep, or medical attention. *Oursborn*, 259 S.W.3d at 170–71. Trickery or deception does not make a statement involuntary unless the method was calculated to produce an untruthful confession or was offensive to due process. *Creager*, 952 S.W.2d at 856.

## 2. State Law

Under Texas law, Article 38.22 also encompasses subjective involuntariness claims that do not turn solely on police overreaching. *Oursbourn*, 259 S.W.3d at 172. This involves "sweeping inquiries into the state of mind of a criminal defendant who has confessed." *Id.*; *see also Lopez*, 610 S.W.3d at 496 n.5 ("[A] defendant can prove that his confession was involuntary based on his state of mind . . . under [A]rticles 38.21 and 38.22 . . . ."). The emphasis is on whether the statement was freely and voluntarily made without compulsion or persuasion or, in the case of a custodial-interrogation statement, whether the defendant waived his rights knowingly, intelligently, and voluntarily. *Oursbourn*, 259 S.W.3d at 172. For example, a statement

---

[4]*Cf. Beecher v. Alabama*, 389 U.S. 35, 38, 88 S. Ct. 189, 191 (1967) (concluding confessions were "the product of gross coercion" when the police ordered defendant at gunpoint to "speak his guilt or be killed").

or confession "given under the duress of hallucinations, illness, medications, or even a private threat . . . could be involuntary under Article 38.21 and the Texas confession statute." *Id.* (footnotes omitted); *see also Cain v. State*, 18 Tex. 387, 389–90 (1857) ("The[ statement] must not have been obtained by the influence of hope or fear, applied by a third person to the prisoner's mind.").

Examples of fact scenarios that could raise a state-law claim of involuntariness include the following:

> (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have "knowingly, intelligently and voluntarily" waived his rights; (3) the suspect "lacked the mental capacity to understand his rights"; (4) the suspect was intoxicated, and he "did not know what he was signing and thought it was an accident report"; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; (6) the suspect was returned to the store he broke into "for questioning by several persons armed 'with six-shooters.'"

*Oursbourn*, 259 S.W.3d at 172–73 (footnotes omitted).

**B. Analysis**

The theory of involuntariness upon which Fuentes relies is unclear.[5] Nevertheless, we conclude that under any theory, Fuentes's statements were not involuntary.

---

[5]In his appellate brief, Fuentes contends that his will was overborne and that he had been tricked, indicating a due process claim of involuntariness. But he also cites Article 38.21, refers to "the statute," and notes *Cain*'s emphasis on a defendant's state of mind. Then, when he jumps to his harm analysis, he contends that the trial court committed constitutional error as it "relates to the Fifth Amendment to the United States Constitution."

Fuentes does not explain how engaging with Mother over the phone overbore his will. He contends only that Mother's questions about whether he had touched Z.G. under her panties "became an interrogation" and that "[t]his was trickery because [he] felt he was not talking to law enforcement." These conclusory assertions are unsupported and do not explain how Mother's questions produced an untruthful confession or were offensive to due process. Moreover, Mother was a private actor, and whether Fuentes consented to the phone call's recording does not affect its admissibility.[6]

Fuentes also fails to explain how Barton's involvement rendered his statements involuntary. Barton did not speak to or address Fuentes at any time during the phone call. Fuentes was not in custody or otherwise detained, and he was able to hang up or end the call at any time. *See Oursbourn*, 259 S.W.3d at 170–71; *Melton*, 790 S.W.2d at 326. Instead, he chose to speak to Mother for approximately ten minutes, providing information both in response to Mother's questions and on his own. Fuentes does not argue how Barton coerced him in any manner, and he has not provided any authority—and we have found none—to support the contention that Barton's

---

[6]Under both Texas and federal law, it is not unlawful to record a phone conversation if the person recording the call is a party to the call or if one of the parties to the call has consented to the conversation's being recorded. *Taylor v. State*, 555 S.W.3d 765, 776 (Tex. App.—Amarillo 2018, pet. ref'd); *Mitchell v. State*, No. 03-09-00643-CR, 2010 WL 5019123, at *1 (Tex. App.—Austin Dec. 8, 2010, no pet.) (mem. op., not designated for publication); *see also* 18 U.S.C. § 2511(2)(d); Tex. Penal Code Ann. § 16.02(c)(4). Here, Mother consented to having the phone call recorded.

9

prompting Mother to place the call and recording the conversation constitutes coercive police behavior.[7]

Likewise, the record does not indicate—and Fuentes does not assert—that he was under duress, that he was hallucinating, that his statements were influenced by hope or fear, that he was ill or on medication, that he lacked the mental capacity to understand his rights, that he was intoxicated, or that he was threatened—by either Barton or Mother. *See Oursbourn*, 259 S.W.3d at 172–73. Indeed, none of the relevant circumstances that could raise a state-law claim of involuntariness are present here.

Under the totality of the circumstances, the evidence demonstrates that Fuentes's will was not overborne and that his statements were freely and voluntarily made. We conclude that the trial court did not abuse its discretion by overruling Fuentes's objection and admitting the recorded phone call and Barton's supporting testimony.

We overrule Fuentes's first issue.

### IV. The Recorded Interview

In his second issue, Fuentes argues that the trial court erred by admitting the recorded statements he made to Barton "as a result of custodial interrogation" because Barton did not obtain a waiver of rights from him. The State responds that Fuentes was not in custody and that his statements to Barton were voluntary.

---

[7]We note that it is the party's responsibility to fully brief an argument and to provide legal authority to support its position. *See* Tex. R. App. P. 38.1(i); *Lucio v. State*, 351 S.W.3d 878, 896 (Tex. Crim. App. 2011).

10

## A. Applicable Law

"Custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. An accused's statements produced by custodial interrogation are inadmissible unless the accused is first warned of his rights under *Miranda* and Article 38.22. Tex. Code Crim. Proc. Ann. art. 38.22; *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630. Thus, an officer's obligation to give the warnings is triggered only when a person is in custody. *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 1528 (1994).

Courts determine whether a person is in custody by examining all the circumstances surrounding the interrogation and resolving whether law enforcement formally arrested the person or, alternatively, restrained the person's freedom of movement to the degree associated with a formal arrest. *Id.*, 114 S. Ct. at 1529. The ultimate inquiry is whether, given the circumstances surrounding the interrogation, a reasonable person would have felt that he was not free to leave. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021) (first citing *Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1528; and then citing *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)). The "reasonable person" standard presupposes an innocent person. *Id.*

There are four general situations that may constitute custody:

(1) the suspect is physically deprived of his freedom of action in any significant way; (2) a law enforcement officer tells the suspect that []he cannot leave; (3) law enforcement officers create a situation that would

11

lead a reasonable person to believe his freedom of movement has been significantly restricted; or (4) there is probable cause to arrest, and law enforcement officers do not tell the suspect that he is free to leave.

*Id.* at 167–68 (citing *Dowthitt*, 931 S.W.2d at 255). Regarding the first three situations, the restriction upon freedom of movement must amount to the degree associated with an arrest, not merely an investigative detention. *Id.* at 168. Regarding the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect. *Id.* But this does not automatically establish custody; custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to a degree associated with an arrest. *Id.*; *Dowthitt*, 931 S.W.2d at 255.

The determination of whether a suspect is in custody must be based entirely on objective circumstances. *Dowthitt*, 931 S.W.2d at 254. Law enforcement's subjective intent and the suspect's subjective belief are irrelevant except to the extent manifested in the words or actions of law enforcement officials. *Id.* The initial burden is on the defendant to establish that his statement was the product of custodial interrogation. *Wexler*, 625 S.W.3d at 168; *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). It is not enough that the defendant only objects to the admission of his statement. *Wexler*, 625 S.W.3d at 168; *Herrera*, 241 S.W.3d at 526.

**B. Analysis**

Based on the objective circumstances surrounding the interrogation, we conclude that Fuentes's statements were not the product of custodial interrogation

12

and therefore, Barton's obligation to warn Fuentes of his rights under *Miranda* and Article 38.22 was not triggered.

**1. The Circumstances Surrounding the Interrogation**

At some point after the phone call between Mother and Fuentes, Barton drove to the Wal-Mart store where Fuentes was working at the time. Barton spoke to an employee at the front of the store and then located Fuentes in a break room with other employees; she did not ask those employees to leave. Barton identified herself to Fuentes and asked him if he would come with her to the district attorney's office to speak with her. She did not disclose the nature of what she wanted to discuss with him. Fuentes agreed and followed Barton out of the store. They got into Barton's black Ford Explorer and drove to her office. Fuentes sat in the front seat of Barton's vehicle; he was not handcuffed. They did not discuss the case during the drive. Barton testified that she had not placed Fuentes under arrest at that time and that she wanted only to get his "side of the story."

When they arrived at the district attorney's office, Barton asked Fuentes to sit in the lobby. Fuentes agreed, and Barton left him alone in the lobby while she went to her office to turn on her recording device. She later returned to the lobby and asked Fuentes to follow her back to her office. When they sat down in Barton's office, Barton told Fuentes that she could "imagine the questions going through [his] head" but that he "probably kn[e]w why" they were there. Less than a second later, and before Barton could ask any questions, Fuentes started talking about the allegations

13

and about the phone call he had had with Mother. Fuentes continued to disclose information despite Barton's attempts to interject, speaking over Barton for almost a minute. When Barton was finally able to speak, she told Fuentes, "I want you to know . . . you are not under arrest, okay? But out of respect for you and out of respect for me, I am going to read you your rights."

Barton testified that Fuentes was not in custody and that he could have "walked away" at any time during the interview. Fuentes never indicated that he wanted to leave. But out of an abundance of caution, Barton warned him of his rights. She had Fuentes read along with her as she read him his rights. Barton asked Fuentes if he understood his rights as she read them, and he responded that he understood. While Barton did not explicitly ask Fuentes if he waived his rights before continuing, Fuentes continued to explain his side of the story. At no point before or during the interview did Fuentes state that he did not want to speak with Barton. Barton testified that Fuentes, by his actions, had impliedly waived his rights and agreed to speak with her.

At the end of the interview, Barton told Fuentes that she was going to step out of her office and asked if he needed any water. She left Fuentes alone in her office and then returned a few minutes later. After the conclusion of the interview, Barton placed Fuentes under arrest.

## 2. The Reasonable Person Standard

The evidence shows that Fuentes voluntarily agreed to accompany Barton to the district attorney's office. Fuentes was not patted down, handcuffed, or otherwise restrained before he got into Barton's vehicle—a plain black Explorer. He sat in the front passenger seat next to her, and there is no evidence that he was locked in the vehicle from the outside or that Barton held him against his will. Indeed, Fuentes was not placed under arrest or forced to accompany Barton. Rather, he could have declined to go with her. The ride in Barton's vehicle would not have reasonably caused Fuentes to believe he was in custody. *See Ervin v. State*, 333 S.W.3d 187, 206–07 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd) (upholding trial court's finding of no custody when appellant was driven in a patrol car to police station for questioning but was not held against her will, handcuffed, or forced to accompany the officer).

Barton explained that she wanted to interview Fuentes to get his "side of the story." She conducted the interview in her office at the district attorney's office rather than at a police station. There, she left Fuentes unattended on two separate occasions: (1) in the lobby before the interview and (2) in her office at the end of the interview. There is no evidence suggesting that the doors were locked or that Fuentes was unable to get up and leave. Neither before nor during the interview was Fuentes told that he was in custody, under arrest, or not free to leave the office. On the contrary, Barton specifically told Fuentes that he was not under arrest. Barton testified that Fuentes could have "walked away" at any time but that he never indicated that he

15

wanted to leave. And the interview was of short duration; it lasted approximately forty minutes. *See Meek v. State*, 790 S.W.2d 618, 622 (Tex. Crim. App. 1990) (finding no custody when suspect voluntarily went to police station, was left unaccompanied at times, and interview lasted "a few hours"); *Ervin*, 333 S.W.3d at 208 (determining interrogation that lasted four hours was noncustodial).

Barton testified that Fuentes had become the focus of her investigation, but at no point leading up to the interview did she tell Fuentes why she wanted to speak with him or that he was a suspect. *See Herrera*, 241 S.W.3d at 525–26 ("The subjective belief of law enforcement officials about whether a person is a suspect does not factor into our 'custody' determination unless an official's subjective belief was somehow conveyed to the person who was questioned."). Barton began the interview with "I can imagine the questions going through your head . . . . You probably know why we're here though." Then, unprompted, Fuentes began to divulge information about the case and about his conversation with Mother—which Barton had not yet mentioned. When Barton was finally able to interject, she told Fuentes that he was not under arrest and then read his rights to him out of an abundance of caution. He then continued to disclose information about his involvement in the case.

Objectively, Fuentes was not aware that Barton had recorded his previous phone call with Mother, and we can only speculate as to what was "going through [his] head" when he agreed to speak with Barton. However, even if Barton had explicitly told Fuentes that she saw him as a suspect in this case, neither being the

16

focus of a criminal investigation nor being questioned at the district attorney's office, without more, made the interview a custodial interrogation. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714 (1977); *Gardner v. State*, 306 S.W.3d 274, 293 (Tex. Crim. App. 2009); *Williams v. State*, 513 S.W.3d 619, 633 (Tex. App.—Fort Worth 2016, pet. ref'd).

Under the objective circumstances, a reasonable person in Fuentes's situation would not have believed, up until the time of his formal arrest, that his freedom of movement was restrained to the degree associated with a formal arrest. *See Dancy v. State*, 728 S.W.2d 772, 777–79 (Tex. Crim. App. 1987) (finding no custody when suspect voluntarily came with police to station, voluntarily answered questions, and was arrested at conclusion of interview); *Williams*, 513 S.W.3d at 633 (upholding trial court's finding of no custody when appellant voluntarily agreed to accompany officers to police station, was transported in an unmarked police vehicle, was not restrained, was told she was not being arrested, and was eventually told she was seen as a suspect); *Allen v. State*, 479 S.W.3d 341, 350 (Tex. App.—El Paso 2015, no pet.) (concluding no custody when defendant voluntarily came to police station, was told he was not under arrest, was not physically restrained, and was left alone twice in interview room); *Wilson v. State*, 442 S.W.3d 779, 781–87 (Tex. App.—Fort Worth 2014, pet. ref'd) (holding voluntary interview did not become custodial when detective asserted defendant would be charged with offense or when defendant admitted accidental penetration of child's sexual organ; holding custody occurred when

detective told defendant he was under arrest); *Hodson v. State*, 350 S.W.3d 169, 174–75 (Tex. App.—San Antonio 2011, pet. ref'd) (concluding no custody when defendant admitted involvement in murder and noting that situations in which manifestation of probable cause triggers custody are unusual); *Houston v. State*, 185 S.W.3d 917, 921 (Tex. App.—Austin 2006, pet. ref'd) (explaining that although "there was probable cause to arrest and the strength of the State's case was readily apparent to all," detectives specifically told defendant that he was not under arrest); *Scott v. State*, 165 S.W.3d 27, 42 (Tex. App.—Austin 2005) ("Although probable cause to arrest arose early in the questioning, the officers never suggested by word or deed that [defendant] was not free to leave."), *rev'd on other grounds*, 227 S.W.3d 670 (Tex. Crim. App. 2007). We hold that the trial court did not abuse its discretion by admitting the audio recording on an apparent finding that Fuentes was not taken into custody and was not deprived of his freedom of action in any significant way until Barton formally arrested him after the conclusion of the interview.

Without a custodial interrogation, *Miranda* and Article 38.22 do not come into play; thus, Barton was under no obligation to warn Fuentes of his rights, and the trial court did not err by admitting his statements. *See* Tex. Code Crim. Proc. Ann. art. 38.22; *Miranda*, 384 U.S. at 479, 86 S. Ct. at 1630; *Stansbury*, 511 U.S. at 322, 114 S. Ct. at 1528.[8]

---

[8]Even if Barton had been under an obligation to warn Fuentes of his rights, our holding would be the same. As heard on the audio recording, when Fuentes began to

18

We overrule Fuentes's second issue.

## V. Conclusion

Having overruled Fuentes's two appellate issues, we affirm his conviction.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 16, 2024

---

disclose information about the case, Barton interrupted him to read him his rights. She asked Fuentes if he understood each *Miranda* right as she read them, and in accordance with Article 38.22, she told him that he had the right to terminate the interview at any time. Fuentes then continued to tell Barton the details of what he had done to Z.G.

The Court of Criminal Appeals has "consistently held that waiver of Article 38.22 rights may be inferred from actions and words of the person interrogated." *Leza v. State*, 351 S.W.3d 344, 353 (Tex. Crim. App. 2011) (internal quotation marks omitted); *Bleil v. State*, 496 S.W.3d 194, 208–09 (Tex. App.—Fort Worth 2016, pet. ref'd). "[I]t is within a trial court's discretion to rely upon an implied waiver whenever the totality of the circumstances, as reflected by the recording of the oral statement, supports it." *Leza*, 351 S.W.3d at 353. Here, Fuentes told Barton that he understood his rights as they were read to him. Understanding his rights, he chose to continue the interview.

Fuentes cites no authority, and we have found none, to support the contention that a waiver must be express. Indeed, the record need only reveal that Fuentes at all times knew he could remain silent and was aware of the State's intention to use his statements to secure a conviction. *See Lott v. State*, No. 02-18-00487-CR, 2019 WL 5792660, at *8 (Tex. App.—Fort Worth Nov. 7, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Leza*). We would therefore hold that the trial court did not abuse its discretion in apparently finding that Fuentes had impliedly waived his rights. *See Leza*, 351 S.W.3d at 353; *Lott*, 2019 WL 5792660, at *9; *Bleil*, 496 S.W.3d at 209.

19